UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAUL BULLOCK,<br><br>**Plaintiff,**<br><br>v.<br><br>KILOLO KIJAKAZI,<br>*Acting Commissioner of Social Security,*<br><br>**Defendant.** | No. 20-cv-1764-ZMF |

## MEMORANDUM OPINION

Plaintiff Paul Bullock ("Mr. Bullock") moves for reversal of Defendant Commissioner of the Social Security Administration's ("SSA" or "Commissioner") decision adopting the findings of an Administrative Law Judge ("ALJ") in denying Mr. Bullock's application for Supplemental Security Income. *See* Pl.'s Mot. J. Reversal ("Pl.'s Mot."), ECF No. 18. The Commissioner moves for affirmance. *See* Def.'s Mot. J. Affirmance & Opp'n Pl.'s Mot. J. Reversal ("Def.'s Mot."), ECF No. 19. Having considered the parties' submissions and the Administrative Record,[1] the court will DENY Mr. Bullock's Motion for Judgment Reversal and GRANT the Commissioner's Motion for Judgment of Affirmance in an accompanying order.

## I.   BACKGROUND

### A.   Statutory Framework

The Social Security Act (the "Act") provides benefits for "disabled" individuals. 42 U.S.C. § 423(a)(1). The Act defines "disability" as the "inability to engage in any substantial gainful

---

[1] The Administrative Record consists of sixty-nine exhibits. *See* Administrative R., ECF No. 9. For ease of reference citations to the Administrative Record will refer to the "AR" and cite to the consecutive page numbers provided in the lower right-hand corner of each page.

1

activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" *Id.* § 423(d)(1)(A). The impairment must be severe and must render the individual unable to perform both "previous work" and "any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 1382c(a)(3)(B); *see* 20 C.F.R. § 416.905(a).

The SSA uses a five-step sequential process to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920(a)(4). If a determination can be made at any step, the SSA does not go on to the next step. *See id.* The burden of proof is borne by the claimant at each of the first four steps and switches to the Commissioner at step five. *See Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004) (citing 20 C.F.R. §§ 404.1520(f), 416.920(f)). At step one, the claimant must demonstrate he is not presently engaged in "substantial gainful activity[.]" 20 C.F.R. § 416.920 (a)(4)(i). At step two, the claimant must show that he has a "severe medically determinable" impairment that "significantly limits [his] physical or mental ability to do basic work activities[.]" *Id.* §§ 416.920(a)(4)(ii), (c). At step three, the claimant must show that his impairment—or combination of impairments—"meets or equals" the criteria of an impairment listed in the Commissioner's regulations. *Id.* § 416.920(a)(4)(iii). If the claimant's impairment does not meet or equal a listed impairment, the Commissioner proceeds to step four, which requires the Commissioner to determine the claimant's residual functional capacity ("RFC")[2] and whether, considering the RFC, the claimant can still perform any relevant past work. *See id.* §§ 416.920(a)(4)(iv), (e)–(f). If the RFC indicates that the claimant cannot engage in past work,

---

[2] The RFC assessment is "what an individual can still do despite his or her limitations . . . [and reflects an individual's] maximum remaining ability to do sustained work activities." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

2

then at step five, the ALJ looks to the claimant's RFC, age, education, and work experience to determine if he can perform "other work" in the national economy. *Id.* §§ 416.920(a)(4)(v), (g).

  B.  <u>Factual Background</u>

Mr. Bullock is an adult male with an eleventh-grade education. *See* AR 37, 197. He previously worked as a landscaper and was last employed as a laborer in 2013. *See* AR 72. Mr. Bullock alleged his disability began on August 1, 2016, asserting an inability to work due to major depressive disorder, anxiety disorder, post-traumatic stress disorder ("PTSD"), irritability, anger, and asthma. *See* AR 196. During the ALJ hearing, Mr. Bullock testified that he had also been diagnosed with insomnia and that his sleeping medication made it "hard for [him] to get up[.]" AR 42. Mr. Bullock confirmed that he was homeless and lived with either a friend or in a shelter. *See* AR 36. He testified that he could participate in daily activities such as cleaning, caring for his therapy cat, seeing his daughters, and using the Internet. *See* AR 45–47.

Mr. Bullock has been treated and evaluated by numerous medical and psychological professionals throughout his life. *See* AR 482–502, 504–506, 544–642. On June 26, 2017, Greg Mathis, LPC, found Mr. Bullock had moderate impairments in his "ab[ility] to fulfill social responsibilities, to interact with others, maintain [] physical functioning . . . [and] self-care[,]" but "maintain[ed] control of any impulsive, aggressive or abusive behaviors." AR 565.

Mr. Bullock reported improved symptoms when compliant with a medication regimen. *See* AR 426. However, one of the drugs, Trazodone, caused excessive sleepiness and nightmares, which caused Mr. Bullock to stop taking it. *See* AR 49. Despite improvements, Mr. Bullock has a history of noncompliance with his medication and treatment plans. *See* AR 390, 394. On December 4, 2018, Dr. Colleen Hawthorne, MD, evaluated Mr. Bullock after he was noncompliant with his medication. *See* AR 829. Dr. Hawthorne found that his "mood disturbances, angry outbursts, low

frustration tolerance, social isolation, and anhedonia . . . contributed to his limited social and vocational functioning." AR 505 (cleaned up). But Dr. Hawthorne noted that Mr. Bullock did not have any suicidal ideation and demonstrated normal judgment, attention, and speech; good insight; and intact memory. *See* AR 833–34. Dr. Hawthorne determined that Mr. Bullock had "no limitation in understanding, remembering, and applying information[;] . . . moderate difficulties maintaining concentration, persistence, or pace; and moderate difficulties adapting or managing oneself." AR 21. Dr. Hawthorne concluded that Mr. Bullock was unable to work. *See* AR 21.

On October 3, 2019, Emmanuel Sango, RN, prescribed Mr. Bullock medication to treat his nightmares and sleep disturbances and stabilize his mood after Mr. Bullock stopped taking the medication prescribed to him in 2017. *See* AR 872.

State and agency psychological consultants also evaluated Mr. Bullock. *See* AR 63–73, 76–88. Dr. Patrica Cott, Ph.D., reviewed Mr. Bullock's medical record. *See* AR 68. On November 22, 2017, Dr. Cott found that Mr. Bullock's mental impairments resulted in moderate limitations in understanding, remembering, and applying information; interacting with others; maintaining concentration, persistence, or pace[3] ("CPP"); and adapting or managing oneself. *See* AR 69–71. Dr. Cott further concluded he was "able to complete tasks during a standard work day and week with limited contact with the public or others who might trigger anger." AR 71.

On April 13, 2018, Dr. Nancy Heiser, Ph.D., found Mr. Bullock had moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a workday without interruptions, interact with the public, respond to changes in his work environment, and make plans independently from others. *See* AR 83–84. Ultimately,

---

[3] CPP is "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Johnson v. Saul*, No. 19-cv-3829, 2021 WL 411202, at *5 (D.D.C. Feb. 5, 2021) (cleaned up).

Dr. Heiser found no severe limitations and determined that Mr. Bullock was not disabled. *See* AR 76–87.

      C.      <u>Procedural History</u>

On October 20, 2017, Mr. Bullock applied for disability benefits. *See* AR 74. On January 5, 2018, the SSA denied his claim. *See* AR 73. Mr. Bullock requested a timely hearing before an ALJ, which was held on December 10, 2019. *See* AR 30.

On January 17, 2020, the ALJ denied Mr. Bullock's claim. *See* AR 12–23. At step one, the ALJ determined that Mr. Bullock had not engaged in substantial gainful activity since the alleged onset date. *See* AR 14. At step two, the ALJ determined that Mr. Bullock had the following severe impairments: depressive disorder, personality disorder, trauma disorder, and substance abuse disorder. *See* AR 14. At step three, the ALJ determined that Mr. Bullock's "impairment or combination of impairments [did not meet] or medically equal[] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." AR 15.

At step four, the ALJ determined that Mr. Bullock had the RFC to perform a full range of work with exertional levels, with limitations. *See* AR 16. Specifically, the ALJ limited Mr. Bullock to occupations with no contact with the public; only occasional coworker contact and supervision; set routines, procedures, and instructions; and few changes during the workday. *See* AR 16–17. Additionally, the ALJ determined that Mr. Bullock could not "climb ladders, ropes or scaffolds; . . . must avoid all exposure to hazards, such as dangerous machinery and unprotected heights; and [could not] drive vehicular equipment." AR 16. Finally, the ALJ asserted that Mr. Bullock could "work with below average work production pressures; . . . maintain regular attendance and be punctual within customary tolerances, and perform activities within a schedule." AR 17.

Finally, at step five, the ALJ determined that when considering Mr. Bullock's RFC, "there [were] jobs that exist[ed] in significant numbers in the national economy that [Mr. Bullock] c[ould] perform[.]" AR 22. The vocational expert ("VE") testified that an individual with Mr. Bullock's characteristics could perform the requirements of the representative occupations of kitchen helper, laundry worker, and floor waxer. *See* 56. Thus, the ALJ ruled that Mr. Bullock was not disabled. *See* AR 23.

On January 17, 2020, Mr. Bullock requested a review of the ALJ's Decision. *See* AR 1. On April 23, 2020, the Appeals Council denied his request. *See* AR 1. On June 6, 2020, Mr. Bullock filed the complaint in this matter. *See* Compl., ECF No. 1. On November 9, 2021, the parties consented to proceed before a magistrate judge for all purposes. *See* Min. Order (Nov. 15, 2021). On May 9, 2023, this case was directly reassigned from Magistrate Judge Meriweather to Magistrate Judge Faruqui. *See* Reassignment Civ. Case, EFC No. 26.

## II.     LEGAL STANDARD

A district court sits in what is essentially an appellate role when it reviews the Commissioner's disability determination, which must be upheld "if it is supported by substantial evidence and is not tainted by an error of law." *Smith v. Bowen*, 826 F.2d 1120, 1121 (D.C. Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Butler*, 353 F.3d at 999 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. Fed. Energy Regul. Comm'n*, 315 F.3d 362, 365–66 (D.C. Cir. 2003) (cleaned up).

"Substantial-evidence review is highly deferential to the agency fact-finder." *Rosello ex rel. Rosello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008). "An ALJ's credibility determinations,

6

in particular, 'are entitled to great deference.'" *Harrison Cnty. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 790 F. App'x 210, 212 (D.C. Cir. 2019) (quoting *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1107 (D.C. Cir. 1998)). "The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment 'concerning the credibility of the evidence with its own.'" *Goodman v. Colvin*, 233 F. Supp. 3d 88, 104 (D.D.C. 2017) (quoting *Crosson v. Shalala*, 907 F. Supp. 1, 3 (D.D.C. 1995)). But the ALJ must have built a "logical bridge" between the evidence and her conclusions so that this Court may "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 67 (D.D.C. 2006) (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).

On review, the "plaintiff bears the burden of demonstrating that the Commissioner's decision [was] not based on substantial evidence or that the incorrect legal standards were applied." *Settles v. Colvin*, 121 F. Supp. 3d 163, 169 (D.D.C. 2015) (quoting *Muldrow v. Astrue*, 2012 WL 2877697, No. 11-cv-1385, at *6 (D.D.C. July 11, 2012)). If the ALJ is found to have applied the correct legal standards and met the substantial evidence threshold, then the reviewing court may grant the Commissioner's motion for an affirmance of the disability determination. *See, e.g.*, *Hicks v. Astrue*, 718 F. Supp. 2d 1, 17 (D.D.C. 2010). If a reviewing court finds that an ALJ erred in his determination that a claimant was not disabled, it may reverse and remand, requiring the SSA to conduct further proceedings consistent with the law. *See, e.g.*, *Jackson v. Barnhart*, 271 F. Supp. 2d. 30, 38 (D.D.C. 2002).

**III.     DISCUSSION**

Substantial evidence supports the ALJ's finding. The ALJ properly conducted the RFC analysis and adequately considered Mr. Bullock's limitations in CPP, daily activities, medication side effects, and medical opinions.

    A.    <u>ALJ Properly Based Conclusion on Substantial Evidence</u>

        1.    *Medical Source Statements*

"ALJs must articulate in their decisions how persuasive they find each medical opinion." *Demetria R. v. Kijakazi*, No. 20-cv-3227, 2022 WL 3142376, at *21 (D.D.C. June 30, 2022), *R. & R. adopted*, 2022 WL 3139026 (D.D.C. Aug. 5, 2022). "Supportability and consistency are the key factors when assessing the persuasiveness of medical opinions." *Id.* (citing 20 C.F.R. § 416.1520c(b)(2)).[4] An ALJ must explain how he considered supportability and consistency in his opinion. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). ALJs must also assess other factors listed in the regulations "but [are] not required to" expressly explain that consideration in their decisions. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). When there are "[e]qually persuasive medical opinions or prior administrative medical findings about the same issue, . . . [ALJs must] articulate how [they] considered the other most persuasive factors . . . in [their] determination or decision." *Id.* § 404.1520c(b)(3).

The ALJ found Dr. Cott and Heiser to be persuasive. *See* AR 21. Mr. Bullock asserts Dr. Hawthorne's opinion was more persuasive than the ALJ gave credit,[5] *see* AR 21, but this

---

[4] Supportability refers to "the objective medical evidence and supporting explanations provided by a medical source." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Consistency refers to the consistency between the medical source's opinion and "the evidence from other medical sources and nonmedical sources[.]" *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

[5] One such reason was that Dr. Hawthorne was the treating physician. *See* Pl.'s Reply at 6. "The treating physician's rule' required an ALJ to give 'controlling weight' to a treating physician's

invites "the Court to reweigh the evidence in [Mr. Bullock's] favor—which the Court cannot do[.]" *Demetria R.*, 2022 WL 3142376, at *22 (cleaned up). "In other words, even if [Dr. Hawthorne's] opinion was persuasive in some respects, the Court must defer to the contrary finding of the ALJ so long as it is supported by substantial evidence, which, again as the D.C. Circuit and Supreme Court have recently explained, is a 'low bar.'" *Id.* (quoting *La. Pub. Serv. Comm'n v. Fed. Energy Regul. Comm'n*, 20 F.4th 1, 7 (D.C. Cir. 2021)).

"That 'low bar' is cleared here." *Demetria R.*, 2022 WL 3142376, at *22 (cleaned up). The ALJ reviewed how Dr. Cott's moderate limitation finding was consistent with the record evidence. *See* AR 21. For example, Dr. Cott found that Mr. Bullock could complete tasks during the workday with little exposure to others based on his feelings of anger and paranoia toward others improving when compliant with treatment and medications. *See* AR 21, 70–71. The ALJ further explained that Dr. Heiser's evaluation confirmed Dr. Cott's findings. Indeed, Dr. Heiser addressed the same symptoms as Dr. Hawthorne—"problems with anger and irritability"—but concluded that a limitation "to routine tasks with infrequent interactions with the public" would still allow Mr. Bullock to work. AR 85; *see* AR 21. The ALJ noted that these findings were consistent with Mr. Bullock's daily activities. *See* AR 21. Drawing on the record, the ALJ then concluded that Mr. Bullock was of "average intelligence, normal judgment, normal attention, good insight, intact memory, and normal speech," with or without compliance with medication. AR 21.

---

medical opinion if it was 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in [the] case record[.]' 20 C.F.R. § 416.927(c)(2). [However, the] 'treating physician's rule' does not apply to cases[—such as this one—]filed on or after March 27, 2017." *Ronald D. v. Comm'r of Soc. Sec.*, No. 20-cv-197, 2021 WL 6133909, at *4 (D. Vt. Dec. 29, 2021) (citing 20 C.F.R. §§ 416.927; 416.920c).

Moreover, the ALJ explained why he discounted Dr. Hawthorne's statements in certain aspects but credited them in others. *See* AR 21–22. The ALJ noted that Dr. Hawthorne's determinations did not account for Mr. Bullock's inconsistent compliance with his medication. *See* AR 21. This is a factor that Dr. Hawthorne should have considered. *See Elder v. Berryhill*, 774 F. App'x 980, 983 (7th Cir. 2019) (ALJ did not err in considering claimant's inconsistent compliance with prescribed medication in disability determination). And Dr. Hawthorne's opinion "was based only on a one-time examination[,]" which explains why it was inconsistent with the record. *Hobbs v. Saul*, No. 20-cv-4, 2021 WL 1574421, at *10 (W.D. Va. Apr. 22, 2021); *see* AR 366, 375. The ALJ explained that he also discounted Dr. Hawthorne's findings over internal inconsistencies: Dr. Hawthorne asserted Mr. Bullock had marked limitations interacting with others and moderate difficulties in CPP and adapting oneself but noted Mr. Bullock had "average intelligence normal judgment, normal attention, good insight, intact memory, and normal speech." AR 506; *see* AR 21. The ALJ further explained that Dr. Hawthorne's finding that Mr. Bullock could not work was "extreme and unpersuasive" given Dr. Hawthorne's observation that Mr. Bullock had no limitation in understanding, remembering, and applying information. AR 20; *see* AR 21. "That is substantial evidence, and other courts have found similar discounting of physician's opinions to be appropriate." *Demetria R.*, 2022 WL 3142376, at *22 (collecting cases).

2.   *Daily Activities*

ALJs may consider a claimant's daily activities when evaluating the severity and credibility of reported impairments. *See* 20 C.F.R. § 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *7. Hence, ALJs regularly consider daily activities when assessing plaintiffs' claims about limited work capacity. *See, e.g.*, *Colter v. Kijakazi*, No. 20-cv-632, 2022 WL 715218, at *13–14 (D.D.C. Mar. 10, 2022); *Grant v. Astrue*, 857 F. Supp. 2d 146, 156–57 (D.D.C. 2012).

Mr. Bullock's testimony about daily activities provides substantial evidence to support the ALJ's conclusion that Mr. Bullock was not disabled. *See* AR 21. For example, the ALJ noted that Mr. Bullock could "fool[] around" on his phone, use public transportation, clean his house, see his children anywhere from twice a month to twice a year, and live either at a homeless shelter or with a friend, AR 51; *see* AR 44–46. The ALJ also noted that Mr. Bullock had no limitations in performing personal care activities and pet care. *See* AR 17–28. These daily activities "demonstrate[d] that while the claimant may be limited by his mental impairments, he c[ould] still perform activities that require attention and concentration, as well as understand[] at least simple, routine tasks and instructions." AR 18; *see Hall v. Kijakazi*, 2022 WL 343504, No. 20-cv-2073, at *6 (D.D.C. Feb. 4, 2022) (ALJ found that reported daily activities indicated the claimant was not as limited as alleged). And "the ALJ did not reason that [Mr. Bullock's] activities of daily living [we]re as demanding as those of full-time work. Rather, the ALJ considered [Mr. Bullock's] activities to determine whether [his] symptoms were as severe and limiting as []he alleged." *Jeske v. Saul*, 955 F.3d 583, 592–93 (7th Cir. 2020); *see* AR 18.

"Were these [] statements to be the only times where the ALJ addressed Plaintiff's daily activities as part of his analysis as to [Mr. Bullock's] subjective complaints of [his] symptoms, Plaintiff would have a more compelling case." *Colter*, 2022 WL 715218, at *14 (cleaned up). "However, the ALJ's opinion makes clear that he recognized and understood Plaintiff's alleged limitations as to [his] ability to perform daily activities." *Id.* For example, the ALJ noted "contrary hearing testimony": Mr. Bullock reported fatigue, low energy and trouble concentrating, only getting four to six hours of sleep a night, not having a driver's license because he was too afraid to drive, and only seeing his four daughters when their mother permitted. *Laura A. v. Kijakazi*, No. 21-cv-451, 2022 WL 3644810, at *17 (D.D.C. Aug. 24, 2022); *see* AR 17–18. "So, like in *Colter*,

11

contrary to Plaintiff's insinuations, the ALJ did not ignore or disregard [his] testimony as to the extent to which []he [could or could not] perform [his] daily activities. Rather, as the ALJ explained, he found that Plaintiff's alleged severity of symptoms was not entirely in accord with [his] professed daily activities, taking into account the relevant limitations." *Laura A.*, 2022 WL 3644810, at *17 (cleaned up).

"More importantly, and as in *Colter*, the ALJ here did not rely solely on the discrepancies between Plaintiff's testimony and [his] daily activities in concluding that [his] symptoms were not disabling." *Id.* "Instead, the ALJ considered Plaintiff's medical records, treatment records, and the opinions of medical experts and found that the record as a whole undermined some of [his] subjective complaints." *Colter*, 2022 WL 715218, at *14; *see* AR 17–22. Moreover, the ALJ accounted for Mr. Bullock's credible symptoms by limiting the available work to below-average work production pressures to manage stress exacerbating Mr. Bullock's symptoms, and to limited contact with coworkers and no contact with the public to manage Mr. Bullock's "anger complaints and his reported history of panic symptoms[.]" AR 20.

Making these detailed findings demonstrated that the ALJ "did not assume [Mr. Bullock could] work solely based on [daily] activities." *Jeanine J. v. Kijakazi*, No. 21-cv-4044, 2022 WL 4483812, at *5 (C.D. Ill. Sept. 27, 2022). In all, over five pages the ALJ discussed how myriad evidence supported his determination. *See* AR 17–22. This is more comprehensive than the norm. *Compare Lane-Rauth*, 437 F. Supp. 2d at 68 ("[T]he ALJ's ruling spen[t] three pages simply listing the plaintiff's entire medical history and then conclusively stating that . . . claimant . . . could perform sedentary work."), *with Williams v. Colvin,* 134 F. Supp. 3d 358, 365 (D.D.C. 2015) (remanding the case when the ALJ did not explain any basis for his findings). Thus, the ALJ created a logical bridge between Mr. Bullock's credible symptoms and abilities, and the conclusion

that jobs existed in the national economy that Mr. Bullock could perform. *See Colter*, 2022 WL 715218, at *15; AR 22.

### B. The ALJ Conducted a Proper RFC Assessment

In determining Mr. Bullock's RFC, the ALJ "buil[t] an accurate and logical bridge from the evidence to his conclusion," properly accounting for the side effects of Mr. Bullock's medication and his mild or moderate limitations in CPP. *Laura A.*, 2022 WL 3644810, at *11 (cleaned up).

#### 1. *The RFC was Appropriately Tailored*

"In essence, an RFC assessment is a function-by-function assessment of a claimant's physical and mental work-related capabilities used to determine what an individual can still do despite his or her limitations." *Johnson v. Kijakazi*, No. 18-cv-2749, 2022 WL 2452610, at *2 (D.D.C July 6, 2022) (cleaned up). The assessment "must include a narrative discussion describing how the evidence supports each conclusion . . . citing specific medical facts . . . and nonmedical evidence." *Id.* (cleaned up). The narrative discussion is not an "articulation of each function and its implication on the ALJ's overall conclusion," rather it must allow a reviewing court to determine that an ALJ "consider[ed] the [whole] record and discuss[ed] which evidence he found credible and why." *Gregory v. Kijakazi*, No. 21-cv-2115, 2022 WL 7463984, at *5 (D.D.C. Oct. 12, 2022) (cleaned up).

Here, the ALJ thoroughly examined both the medical and nonmedical evidence and concluded that Mr. Bullock was able to perform work at all exertional levels with the following limitations:

- <u>Physical</u>: cannot climb ladders, ropes, or scaffolds, must avoid all hazards, cannot drive vehicular equipment;

- <u>Mental</u>: able to understand and carry out simple, routine instructions, able to sustain concentration for two-hour periods at a time, able to use judgment in making work decisions, able to work with below-average work production pressure; and

- <u>Social</u>: only occasional coworker contact and supervision and no contact with the public.

*See* AR 16–17. The ALJ further explained how his evaluation of evidence—such as medical opinions, daily activities, Mr. Bullock's testimony, and the VE's testimony—informed his final determination that Mr. Bullock was not disabled within the meaning of the Act. *See* AR 17–22. Thus, "the ALJ did more than merely list the evidence." *Pinkney v. Astrue*, 675 F. Supp. 2d 9, 17–18 (D.D.C. 2009). Instead, "[t]he ALJ explained which evidence he found credible and why," while providing a sufficient explanation of Mr. Bullock's limitations. *Id.* at 18. In so doing, the ALJ built a logical bridge to his conclusion, allowing this Court to assess the validity of the agency's ultimate findings and afford Mr. Bullock meaningful judicial review. *See id.* at 17.

2. *Medication's Sedative Side Effects*

Relevant evidence in the disability determination includes "how functioning may be affected by factors including . . . medication[.]" 20 C.F.R. § 404.1520a(c)(1). It is "an ALJ's duty to develop a full record [which] can include investigating the side effects of medications." *Walker v. Comm'r of Soc. Sec.*, 404 F. App'x 362, 366 (11th Cir. 2010). "Consideration of the side effects of medication applies to *both* the assessment of functional limitations *and* the RFC assessment." *Lomax v. Comm'r of Soc. Sec.*, No. 20-cv-55, 2021 WL 3508087, at *6 (D.D.C Aug. 4, 2021) (cleaned up).

The ALJ stated that he considered "the type, dosage, effectiveness, and *side effects of any medication* the individual takes or has taken." AR 18 (emphasis added). Mr. Bullock alleges that

14

the ALJ failed to address the side effect of drowsiness from his medication. *See* Pl.'s Reply at 3. "We have previously observed that drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations[.]" *Rutherford v. Barnhart*, 399 F.3d 546, 555 (3d Cir. 2005) (cleaned up). Neither the medical records nor Plaintiff's testimony demonstrated that Mr. Bullock's drowsiness was disabling. *See* AR 42, 49; *see also Caitlin v. Kijakazi*, No. 17-cv-1939, 2022 WL 17370231, at *23–24 (D.D.C. Oct. 27, 2022) (ALJ correctly determined claimant was not disabled despite chronic fatigue disorder, insomnia, and medication side effects by relying on evidence including medical opinions, medical records, and testimony). Indeed, Mr. Bullock said he "just [got] tired," and that it was difficult to wake up in the morning. AR 43, *see* AR 40.[6]

The cases Mr. Bullock cited are distinguishable. *See* Pl.'s Mot. at 13. For example, in *Martin v. Apfel*, the Court reversed the ALJ's decision because the ALJ *ignored* uncontradicted testimony from the Plaintiff that his medications caused him to be *excessively* drowsy. 118 F. Supp. 2d 9, 16, 18–19 (D.D.C. 2000). And in *Newton v. Apfel*, the ALJ considered on remand Plaintiff's ability to remain gainfully employed given that she had to visit the doctor often and that her treatment caused her to sleep for several hours during the day. 209 F.3d 448, 459 (5th Cir. 2000). These complaints are more severe than Mr. Bullock's. Mr. Bullock did claim that the medication's side effects made him sleep during the day, let alone in such extreme amounts. *See* AR 42, 49.

"An ALJ's discretion is at its apex when weighing evidence and testimony." *Lomax*, 2021 WL 3508087, at *8. The ALJ specifically mentioned the claimant's "sleep difficulties" after starting new medication in 2017 and that the claimant reported low energy and fatigue in October

---

[6] Mr. Bullock testified Trazodone caused excessive drowsiness. *See* AR 49. But because Mr. Bullock stopped taking the drug, the ALJ did not need to consider its impact. *See* AR 49.

15

2019. *See* AR 18–19. This demonstrates that the ALJ weighed Mr. Bullock's drowsiness when making his determination. *See Grant*, 857 F. Supp. 2d at 156 (court found ALJ properly acknowledged claimant's reported drowsiness but found reported daily activities supported a finding of no disability). The record, including Mr. Bullock's daily activities, supported the ALJ's decision to find that this side effect was not disabling. *See id.*; AR 44–47, 51. Thus, substantial evidence supports the ALJ's determination, which adequately considered and explained the medication side effects on Mr. Bullock. *See Grant*, 857 F. Supp. 2d at 156.

        3.    *Moderate Limitation in CPP*

The ALJ found Mr. Bullock had a moderate limitation in CPP. *See* AR 15. This "means that the claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis [wa]s fair." *Laura A.*, 2022 WL 3644810, at *11 (cleaned up). Fair is "commonly understood to mean not very good or very bad: of average or acceptable quality." *Id.* (cleaned up).

Mr. Bullock alleges that "[a]s a matter of law, finding moderate limitations in the domain of [CPP] requires an additional finding of diminished ability to stay on task." Pl.'s Mot. at 12. This conclusion is based on the premise that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in [CPP]." *Petty v. Colvin*, 204 F. Supp. 3d 196, 206 (D.D.C. 2016). Mr. Bullock is incorrect. A finding of moderate limitations in CPP does not require a finding of diminished ability to stay on task, rather it requires that the RFC and the hypotheticals provided by the ALJ "adequately accounts for a claimant's moderate limitations in [CPP]." *Id.* Further, "an ALJ's decision is not necessarily internally inconsistent when an impairment is found to be severe[,] . . . [but] found not disabling[.]" *McIntyre v. Colvin,* 758 F.3d 146, 151 (2d Cir. 2014). But an ALJ cannot merely limit work to simple, routine, and unskilled tasks to account for a claimant's moderate CPP limitations. *See id.*; *Mascio*

16

*v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (remanded because the ALJ did not explain how claimant's limitation in CPP did not affect their ability to work and did not include any mental limitations in the hypothetical provided to the VE).

Here, the ALJ adequately explained how Mr. Bullock's RFC limitations accounted for his CPP limitation. The ALJ found that Mr. Bullock had a moderate limitation in CPP but stated Mr. Bullock's daily activities—such as watching TV, reading, using the Internet, and handling his medical care—showed that his limitations were not debilitating. *See* AR 15. The ALJ stated that Mr. Bullock could "sustain attention and concentration for two-hour periods at a time and for eight hours in the workday on short simple routine instructions." AR 16. Further, the ALJ explained that despite Mr. Bullock being "distractable," AR 18, and his symptoms being "worsened by complicated situational stressors" and noncompliance with his medication,[7] AR 19, Mr. Bullock retained the ability to understand, remember, and carry out short, simple, routine instructions. *See* AR 20. The ALJ's conclusion drew upon Mr. Bullock's daily activities and Dr. Hawthorne's testimony that Mr. Bullock had "normal attention," good insight, intact memory, and normal speech. AR 21; *see* AR 70, 85. Thus, substantial evidence supports the ALJ's conclusion. *See Mcintyre*, 758 F.3d at 152 (substantial evidence supported ALJ's determination and the explanation of limitations sufficiently accounted for claimant's impairments) (cleaned up).

Moreover, the hypothetical that the ALJ provided to the VE "adequately" captured Mr. Bullock's limitation on CPP by using time and complexity limitations. *Petty*, 204 F. Supp. 3d at 206; *see* AR 56. *Compare White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 288 (6th Cir. 2009) (ALJ explicitly stated to VE that claimant had moderate limitations in CPP), *with Winschel v. Comm'r*

---

[7] *See Darlene M. v Kijakazi*, No. 20-cv-1817, 2021 WL 6841641, at *22 (D.D.C. Sept. 3, 2021) (failure to comply with medication treatment was factor ALJ could consider when assigning weight to subjective evidence on symptoms provided by claimants).

*of Soc. Sec.*, 631 F.3d 1176, 1180–81 (11th Cir. 2011) (ALJ did not indicate that medical evidence suggested the claimant's ability to work was unaffected by CPP limitation nor implicitly accounted for the limitation in the hypothetical posed to the VE). The VE concluded that a claimant with such limitations could perform occupations that exist in the national economy. *See* AR 56. The ALJ thereby sufficiently accounted for Mr. Bullock's ability to stay on task with the VE and properly considered the VE's opinion in his RFC determination. *See Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (ALJ did not explicitly include limitation of CPP but accounted for it implicitly by restricted complexity and quota limits).

## IV.   CONCLUSION

For the foregoing reasons, as set out in an accompanying order, the Court will DENY Plaintiff's Motion for Judgment of Reversal and GRANT Defendant's Motion for Judgment of Affirmance.

Date: August 8, 2023

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE